All right, this is the case of N. Ray C.B. O'Meara, the state of Illinois, as petition of Pelley v. Charnell J. and Chenelle B., who I can't seem to keep the name straight. You have the appellate court of Justice Cynthia Cobb, Justice Nathan House, and Justice James Fitzgerald Smith. Our procedure is we give you basically 15, maybe 18 minutes. We usually do not interrupt you unless you go way off on tangents. I don't know how much you thought about going into detail on the facts, because we pretty much know them. But anyway, we give you the time, and we usually don't interrupt. And then after you've presented, then we ask questions, and then we go to the appellee and do the same, and then we do the closing. So with that, the appellant may proceed. Thank you, Your Honor. If it may please the court, my name is David Gotch. I represent the natural mother. I believe counsel is also for the natural fathers, Jeffrey Gunn. We had kind of informally worked out dividing the time today equally with the court's permission. I can go first if it will please the court. Fine. Thank you, Your Honor. Very quickly, this is, in my view, it's a very atypical case, untypical. I have been on the TPR appellate panel, which I consider a great honor to be on that panel. I've done about 30 appeals. I know this court has probably seen far more than that when it comes to this type of case. The facts here seem very unique in that respect because it comes down, at least in my eyes as far as a natural mother, down to really three things that you normally don't see happen. The most striking, as I've argued in the brief, is just the incredible turnaround that happened when she was incarcerated. Obviously, we're not arguing an issue of unfitness because the statute's written the way it is written, and then we sort of waive that coming in. But I think one of the key issues is what role does a parent's conduct play going into the best interest portion of the hearing? The factors, we have about nine or so best interest factors when we look at juvenile court, but it's, in my view, my argument is that it's sort of look through that prism of how the child is impacted. Case law has at least historically looked at maybe a parent's conduct while a case is proceeding. Maybe in somewhat of a negative context, I've seen a number of decisions issued where somebody's continued use of drugs or homeless problems or other issues sort of make reunification not practical as part of a supporting basis for affirming a trial court's decision. The issue here is whether the door can swing the other way, and I would submit that the factors don't make a lot of sense if we don't at least allow us to give a parent some hope to dangle that carrot out. There's a couple ways maybe you can interpret the trial court's comments on page 349 to 350 of the report of proceedings. There was an objection made when we started to get into testimony regarding what the natural mother had learned, and there was some discussion. Of course, the court had taken additional notice of what had occurred at the unfitness hearing, but there was also some discussion that there was a want of relevancy there. We still, despite that objection, did get a couple critical facts in. I think the most critical was that the mom, according to the caseworker, Lisa, who was covering for another caseworker, it was her understanding that the house had passed a SRAP. I hope I'm pronouncing that correctly. I'm terrible with acronyms. As the court probably is aware, this was done twice. Originally, it was done back in 2021 where it had failed, but the second time it was her understanding that it had actually passed. The reason the case came into the system as we look at is really twofold. One, we had the failure to really follow up on the STI, but I would submit the biggest issue was the cocaine problem that had existed up until that point and the noncompliance. The state and the OPG didn't carry much objection to the 12 exhibits that mom had presented. A lot of those were reports regarding kind of glowing letters of recommendation. One had indicated 401 days of sobriety, if you will. This is, in my view, a very almost unprecedented issue. It goes well beyond that flurry of activity that sometimes we might see when the case changes from return home to TPR. This is, in my view, the equivalent of kind of turning a tanker in the middle of a hurricane and doing it somewhat successfully. There's also other reasons why I think the best interest was the facts presented in the court's decision were against the manifest way. Lisa, the caseworker, had testified. I understand she was covering for somebody. I've had the privilege and the honor of being able to do TPRs outside of Cooke. I think there's a really a huge difference. Just to put my argument in context between how it's done outside of here, which is that in a lot of counties, they will present a written best interest report. It's not something that I normally see when I do panel work here in the county. Sometimes that might be admitted work. It kind of goes through where the child's going to school, what they're doing during the doctor's appointments, and et cetera. Here, there was some mention of case notes that had been looked at by Lisa. They were not introduced. They weren't used to recollect on the memory, and it seemed that a lot of times, Lisa struggled to kind of remember anything beyond just the very, in my view, bare minimum, which was like, is the child up to date on medicals? Yes. Do we have any specifics on any of these? That's kind of where her memory failed, I think, in many instances where I noted in the brief. Then the last reason why I think this is against the manifest way of the evidence is that there seem to be some health issues with the foster. We don't really get much into that. We get a kind of a cryptic answer, whether the issue's been resolved. Is it yes or no? We have a case here where the parent is still bonded with the mother. I know that's not the only reason why we might affirm, but I think when we look at this particular case, look at the best interest factors here, this seems to be very different than what we will normally see in analogous cases. For those reasons, I would argue that the court's judgment was against the manifest way to the evidence. With that, I would rest on those arguments. I have one question up front. I don't know if it's the grandmother or the aunt or what she is, but she, for four years, carried the water in this case, whereas these two kids, especially the wife, did nothing for at least three years up front. Then because she went in jail, it seems like maybe they beat her into waking up. Can you honestly say that it's in the best interest of this child who spent four years in a relatively normal life now, not having to deal with two people that I question are useful people, period? Your Honor, and hopefully I'm not misremembering the facts, and I apologize if I do, I believe the placement had been changed up to about two years before the TPR to a better placement as far as, and I think that was done at a convenience for the parents, because as Your Honor probably remembers, my client was now down, I think down in the Rantoul area in Champaign County. I would submit the whole purpose of the juvenile court system, at least in regards to this, is to take kids that are in problematic environments, take them out, give the parents the services they need, give them an opportunity to redeem themselves, and if they're able to do that, return the child or children to them. And if they can't, then we have options such as TPR, guardianship, or maybe something else. To completely say that we cannot give a parent an opportunity in extreme cases to redeem themselves, I think is counter to the spirit of the statute, Judge. Any other questions? I do. Justice House, you're trying to get in? You're muted, Justice House. You're still muted. Yeah, you're muted. There you are. I'm on, thank you. Hopping on to what Justice Smith is talking about, you know, we talked about the best interest of the child. Mr. Goff, you seem to be concerned about motivation for the parent. We're trying to do the best thing for the child, aren't we? And here we have an individual whose behavior did change while behind bars and had no option to use cocaine, but a child in four years living with a relative in a stable situation, isn't that the best interest rather than using the child to try to rehab the parent? Which is what I'm getting from what you're saying. Motivation, giving, you know, hanging carrots off of the parent. We're trying to adjust the child. Yeah, and that's an excellent point, Your Honor. What I would say in this case, though, what makes this case very unique, at least from the others that I've had the privilege of being able to work on, is that after this had happened, mom had kept consistent relationship with the child. There had been an admission by, I think, everyone. There was still that bond that still existed there. The child still refers to mom as mom. I would say this is a little bit different from a case where, you know, sort of the parent kind of goes MIA for a long period of time. We had inconsistent visitations. The child has sort of gotten acclimated and kind of moved on with their life to a certain degree. In this case, I think we should look at what a parent has been able to do, what they've been able to accomplish, what they can provide. We still have those best interest factors. And I understand that the statute says that when we get to this phase, we are looking at those nine factors, the child's adjustment. But there's also other factors here in this case that I think go in my client's favor. You know, one of those things being that particular bond that I discussed previously. I don't think this is a case where, you know, where all hope is lost. So for these reasons, I hope the court gives it appropriate consideration. And I hope I've answered your question, Your Honor. Okay. I have nothing further. Counsel, at what point, though, it seems to me that we might be going down a pretty slippery slope. I absolutely understand that mom has made terrific progress in terms of rehabilitation. But we're talking about a child who's, what, five or six years old, who has, since the time he was taken from his mom's care, has not lived with his mom. Unsupervised visits have never been recommended by any of the caseworkers. This child is in a stable relationship, refers to both the foster mom and his birth mom as mom. At what point do we then, considering the best interest of the child, understand that there's been some redeeming factors on the side of the parent, but in the best interest of the child, notwithstanding, leave that relationship intact? Yeah, that's an excellent point, Your Honor, because we don't have, there's kind of, I would submit there's kind of a dearth of case law in terms of how much weight a parent's redemptive efforts should play at the best interest. And there's also, I imagine, policy concerns as well, where somebody waits until they've had the unfitness finding, then all of a sudden, or around that period, they start doing the classes they're supposed to do. And there's been cases that talk about that flurry of activity that sometimes briefly wakes a parent up. I did terrible when I was in Latin. And so I know the term is like sui generis, each case is to its own. I hope I'm not horribly butchering it. So each case is somewhat determinative in its own facts, and which makes it sometimes difficult to take one case and argue with another. In my brief, I note that recent Rule 23. Of course, there's also unique facts to that one. One of those in that case was the child was struggling to bond with the new placement. I would submit that it's not a slippery slope. I would submit that you really need some very unique, incredible, extraordinary circumstances here. Without objection, the state allowed in some very, I think, laudatory letters of recommendation that had come in that had talked about her kind of formidable ability to kind of turn the ship around. This is a little bit different or a lot different, I would submit, than somebody who said, okay, I'm going to start going to a couple counseling classes, or maybe I'll start attending some drops, or maybe I'll just go to a couple visitation points. I think the conduct of the parent should be considered, and I think if it's a very extraordinary situation, it should be given appropriate weight. It's sort of in my argument, and Your Honor may disagree with my reading of the report of proceedings, and I apologize if I got it wrong in that respect, but as I look at page 349 to 350, it appeared to me, as I argued, that the trial court was discounting what mom had accomplished during that time. It was kind of hyper-focused just on those statutory factors. I'm sorry. I think we might disagree on the tenor of the trial court's comments. I would agree with you. We're going to disagree on that, but you did cite Blaze, the Fifth District case, and I've read Blaze and reread Blaze and find it absolutely distinguishable. Is there something in particular about Blaze other than the fact that there is this kind of like redemptive position that the court should consider in this best interest analysis? Well, much like in Blaze, the parents' efforts in Blaze, that wasn't the only reason why the appellate court obviously went in a different direction. They wrote a detailed opinion, explained all the unique factors that were there. That was just one of them, and I kind of argue that here as well. This isn't the only thing I'm kind of resting the case on, although admittedly I've spent most of my time speaking about that very unique thing, just because we have that dearth of case law, in my view, about what the positive efforts are. We have plenty of case law about the negative efforts. Somebody lost their home, they're homeless, or they're still doing these things. It doesn't make any sense to return the child into an environment, despite what the best interest factors might be, if we still haven't gotten those monkeys off the parents' back. But here, I would also point to just the caseworkers. I wouldn't call it want of interest. That's certainly not what it was. Certainly, I would say it was a want of memory or recall on the caseworkers end, covering particular facts that you would normally see go into great detail at the best interest. We had a little bit here, but I think there was, I kind of listed off a paragraph or two in my brief, noting the specifics of the schooling, or the specifics of the bond, or what efforts, what mom's situation was, just the inability to recall. Then we get to, and I hope I'm not misremembering terribly, but we get to the foster, and we don't get much specifics as to that, either by when the state elicits his testimony. So, I think there wasn't a lot there that we normally see in analogous best interest hearings. So, I think coupled with mom's efforts, or with the caseworkers' struggle at getting specifics, we didn't have an opportunity to either admit the case notes or use them for a memory recollection. And also, what might be, and we didn't get much development on this, but we certainly had some testimony that the foster was, the great aunt, if I'm remembering correctly, was hospitalized on two occasions, one time for three days, and the next time for five days. And even her concession that maybe the issue isn't entirely resolved. She says yes or no. I don't know what you would make of that. Obviously, if the issue had been taken care of, there wouldn't be a yes in there. So, I think for the reasons with mom's efforts, and also the burden being with the state, and the inability to recall these things, I think the court got this one wrong. Is it Mr. Gannon's turn? It can be, Your Honor, if that's where you'd like to go. Yeah, let's hear. Yes. May it please the court. My name is Jeffrey Gunn. I represent the father, Sharnell, in this case. And like you, Judge, I do get all the parties mixed up. They all seem to have very similar names. In any case, our position was that the ruling that the father was unfit was not supported by the evidence. He was found unfit on three different grounds, ground N, ground M1 and M2, and then also on ground B. I think I should start with ground N. Ground N is a provision that identifies the kind of evidence that the trial court may rely on to determine whether, in fact, the parent has foregone his or her parental rights. And they list a number of different bases for inferring his intent. And in this particular instance, one of those grounds, by the way, is visiting the child, communicating with the child or agency, et cetera, et cetera. In this particular instance, there isn't any doubt, there isn't any dispute as to whether the father, over a 12-month period, visited and contacted not only his child, but also the agency. There was no doubt about that. The guardian ad litem in this case argued that the father did not show any, I'm sorry, the evidence showed that the father did not indicate that he was concerned about the future of the child insofar as he didn't complete certain service plans, which I'll get, that I'll address a few minutes from now. But in that case, they admitted that the father, in fact, did contact his child throughout the 12-month period. There was never a period of time in which he didn't do that. The court found that, without explaining why, that the father was not fit under Brown N. And we argue that there is no basis in either law or fact that would allow for such a thing, for such a finding. In its response brief, the public guardian suggested that they could read this statute, this portion of the statute, Brown M, as a disjunctive, in a disjunctive way, I should say, and that they, in other words, that the child could have been visited throughout the 12-month period. But if the father acted irresponsibly, then they would fail under Brown N. And I believe that that is, the statute cannot be read in that particular way. There are other statutes that have the disjunctive in which every ground has to be, or I should say, every element has to be shown. For instance, one statute is Ground B, where a parent is deemed unfit if they fail to show interest, concern, or responsibility towards the child. But that has to deal with a different purpose than Brown N. Brown N is defining the kind of evidence that could be used to discern whether the intent of the parent is to forego rights. Ground B looks towards what makes up a reasonably good fit parent, as opposed to an unfit parent. I think of Brown N as a kind of a stool, a three-legged stool, in which you place the child. And if you remove one leg of the stool, then the child is harmed. That is not what Brown N tries to do. Brown N tries to find evidence of someone's lack of interest, or I should say, lack of interest in... Actually, you're going to have to quit reading the individual letters. We know what they stand for. Get to your point. My point is that Brown N was wrongly decided in this particular case. There is plenty of evidence. There is overwhelming evidence that the parent visited his child, communicated with his child, was interested in his child. And it's that evidence that demonstrates that Brown N cannot be supported in this case. Now, if the court doesn't have any questions about that, I can move on to Brown N. Oh, well, I appreciate that, Your Honor. Then in the circumstances, maybe it would be better for me to take questions from the court about my detailed arguments in the brief, rather than waste its time. Mostly, I'm going to repeat what is already written in detail in my brief. My feeling is that with regard to Ground M and Ground B, there's not sufficient evidence to support the allegations as specifically set forth in the statute. The statute controls here, especially in a case where we're dealing with the parental rights, the constitutionally recognized parental rights of this particular father. If those rights are to be taken from him, then they need to be taken strictly from the statute. I'm making arguments to the trial court, not to the appellate court. So I'll let the appellate court judges ask you questions, if they have any. Thank you, Your Honor. Questions? Justice Smith, I'll just have one. With respect to those drug drops, which is, I think, a huge concern in this case. Sure. Are you suggesting to the court that your client was consistent in completing those necessary or those required drug drops? In this particular instance, Your Honor, I would point out in the record where he purportedly failed a drug test in one of the drug drops. And he complained that that's not true, that he wasn't taking drugs. So he made that complaint. And the service decided or the agency decided that they would refer him to be analyzed as to whether, in fact, he was required to take. To determine whether, in fact, he required to take more drug tests or whether there was some therapy that he could take to deal with his drug issue. It came back. We never saw the results of that report. But it came out during the testimony at page 109 and 110 that there was no recommendation that he undertake drug therapy or dealing with drug issues. And that the only reason that they asked him to continue to take drug drops is because he hadn't been consistent with doing it beforehand. But there was no finding that he has a drug problem, that he takes drugs, and he denied consistently and has always denied. Afterwards, he did continue to take drug tests, but they were not as consistent as he should have been. That's true. But at the same time, the case law states that if the services are required, they need to be required in instances where it's necessary for them to have this requirement. In this particular instance, the drug assessment was that he didn't need to have any further help in dealing with his drug problem, presumably because he had no drug problem, as he has consistently stated throughout. Also, with regard to the drug test in this instance, there was an objection at the trial that they were not certified. It was let into the record anyway, and we contend that it was done so over the hearsay rules that control this particular trial. There was also apparently a second drug test that is made reference to, but is not actually provided in the record, certified or uncertified. So if it wasn't in the record, we don't want to hear about it. If you don't have anything further, let's move on. All right. I guess at this time, if there's no other questions from the panel, I will reserve any time for reply. David, what have you got? Three minutes. Okay. I'll reserve three minutes then for reply. David? Yes, Your Honor. If there's any reply needed, I'll reserve that time. I don't know how many minutes I have. That's why we're waiting for your reply. We've asked all our questions. We're waiting for your reply. The state has something to say, I think. Right. I think we want to hear from the state first, Justice Fitzgerald-Smith. All right. And then maybe your reply. Go ahead. Briefly. Thank you. We'll move on. Good afternoon, everyone. Assistant State's Attorney Marina Parra on behalf of the people. At this time, the people will be adopting the guardian ad litem argument in its entirety and asking this court to affirm the findings of the juvenile court. Thank you very much. That was easy. All right, I guess now. I'm sorry, Justice House, were you speaking to me? Yes, were you presenting anything? Okay. I do have an argument if it would please the court. Good afternoon, and may it please the court. I am Julianne Johnson. I'm the assistant public guardian here representing CB, who is six years old now. And CB respectfully requests that you affirm the trial court's termination of parental rights so that he can be adopted by his aunt, which is what he wishes. The trial court order could be affirmed because Mr. B was unfit because he failed to engage in services. Mrs. J was unfit and has conceded that she was unfit and has forfeited that argument. And third, because the preponderance of the evidence showed that terminating parental rights was in CB's best interest based on the statutory best interest factors. In affirming this order, you will allow CB permanency through adoption by his aunt, with whom he has lived for about five of the six years of his life. As your honors heard, Mr. B was found unfit under three separate grounds. Ground B, I will be asking you to affirm based on his lack of reasonable responsibility for CB of those disjunctive factors that were discussed. Underground M, I would ask that you affirm based on his lack of progress. Underground M, there are two subparts, reasonable efforts to correct the conditions that brought CB into care or reasonable progress towards reunification. And because those are disjunctive, I'm asking you to affirm the unfitness based on lack of progress. Both of these grounds are related to CB's engagement in services or lack thereof. Excuse me, Mr. B's engagement in services or lack thereof. Mr. B was recommended to engage in individual therapy, parenting classes, and random drug drops. And he did not meaningfully engage in any of those prior to his incarceration in December 2022. For individual therapy, he was referred three separate occasions and didn't actually participate until October 2022 and only attended two sessions before he was arrested. Regarding the parenting classes, though he did engage in parenting classes, he was later detained for shoplifting while on a visit with CB for CB's birthday. And based on that, the agency rated him as unsatisfactory in demonstrating safe parenting of CB. And finally, as Justice Cobbs indicated, Mr. B failed to attend a majority of his referred drug drops. He was referred twice per month, but he didn't attend any drops between November 2020 and September 2021. He tested positive for cocaine in January 2022 and then attended only half of his drops before again testing positive for cocaine in July of 2022. Then he only attended one drop before he was arrested. The agency was concerned about Mr. B's sobriety, not just based on the positive drops, but also, as Justice Cobbs indicated, all of the missed drops that were presumptive positive. Now, Mr. B has argued that the drug tests where he tested positive are inadmissible hearsay. I will note, as I did in my brief, that he did not raise a hearsay objection about those tests in the trial court and has forfeited that argument. However, if your honors would like to. No, no, keep moving. Thank you, Your Honor. I'll just note that under Section 2-18-4A, those were admissible records as a business record exception under the JCA. Based on all of this, Mr. B's unfitness findings under B and M were not against the manifest weight of the evidence, and I would ask you to affirm both of those. I would also just note that while Mr. B and Mrs. J were working to minimally engage in services, CB, his time did not stop. He continued to grow and bond with his caregiver, and the lack of engagement in services did not pause his development. Moving on to best interest, as your honors seem notably interested in that. First, I'll note Mr. B did not, in his brief, raise any arguments regarding best interest and has forfeited that. But I will specifically turn your honors' attention back to the best interest factors in the Juvenile Court Act, which is Section 1-3405. I'll note that of those, they include things such as CB's development of his identity, his attachments, including where he feels love, a sense of security, and the least disruptive placement for him. CB's wishes are included in those factors, his need for permanency and continuity of relationships with parental figures, and also the preferences of his caregivers. And based on those factors, the preponderance of the evidence showed that termination was in CB's best interest. He has lived with his aunt for more than 80% of his life. He has developed his identity in this home. He's developed an attachment to Yolande, and he refers to her as mommy or yaya. He calls Yolande's grandchildren his brothers. He told Yolande he wants to be adopted by her, and then he specifically says he was made especially for her. She has provided him with stability and continuity for the five years now that he's been in her home. And she also testified that she would allow for visits with both of his parents as long as it was in CB's best interest. Mrs. J has argued that the trial court discredited the services that Mrs. J was engaged in at the end of the case. However, well, first off, the best interest factors don't include parental services. Secondly, the court did, as Mrs. J's attorney noted, the court did take judicial notice and actually commended, at a fitness hearing, commended Mrs. J about her engagement in those services. It also heard testimony at the best interest hearing about her current visits with CB, her employment, and her housing. However, as N, Ray, and T states, when considering the best interest of a child, another thing that the court can consider is the nature and length of the child's relationship with their current caregiver and the effect that a change of placement can have on the child's emotional and psychological well-being. That's particularly meaningful in this case because CB views Yolande as his parental figure. He's lived with her consistently since he was one year old. The trial court examined all of those best interest factors and determined that it was in CB's best interest to terminate parental rights. And I don't think that that was against the manifest weight of the evidence. I would ask that you affirm the trial court's order so that CB can be adopted by his aunt. Thank you very much, and I invite any questions. I don't have any questions. I have none. We'll go to Mr. Gatz. David, you can do your conclusion. Yes, just very briefly. I will just note I understand there was testimony by the caseworker regarding the child's preference. Lisa, I don't believe, was able to recall the child's position. That's the caseworker. I would note, though, the child, I think at the time that conversation took place, assuming it was contemporaneous with the best interest hearing, was around five years old or so. So sometimes those conversations are going to be a little bit different than if the child is nine or ten years old. The other thing I'll note regarding the trial court's recognitions of mom's efforts, I think the OPG accurately stated it happened during the unfitness hearing, and that's somewhat my point, which is that it did not, in my view, occur or there wasn't much recognition of it at the best interest hearing. We do have those best interest factors that the public guardian went through in great detail, but also by creature of case law, we've added additional factors over the years, such as the length that the child has been at their current placement. And I would submit that one of the additional factors that should have been given weight here, along with the other ones, was just the mom's redemptive efforts during that time. And with that, I would just rest on the other arguments raised in my brief and in my reply. Any questions? No. Mr. Gunn? Your Honor, much of what was said by the public guardian is addressed in detail in the timeline that I placed in my brief. One glaring error, I believe, that the public guardian stated is that in this particular instance, the father failed to perform services. And specifically with regard to the therapy, he was not referred to therapy until January of 2022. But it wasn't until October of 2022 that he was able to get into class. He was waitlisted, Your Honor, for many, many months. And when he did go to class, he took two classes beginning on October 22. And by 1222, he was placed in jail. Now, there is a suggestion here that he was placed in jail or somehow some particular visit was disrupted by virtue of the fact that he was arrested for shoplifting during a visit. There is no evidence of that in the record whatsoever. It was attempted to be raised during the trial. There was an objection. The objection is sustained. There is no evidence. There is some reference to it in a particular report, service report. But the service report, the person who authored the service report, stated during the trial testimony that she did not know why the person was arrested. And she believes that his later incarceration was because of some other offense. And I suggest that if the court were to carefully review my timeline, it would, in fact, lead to the conclusion that there was no time in which the father was given an opportunity to perform services that he did not, in fact, perform them. In this particular, the argument that we have with regard to Ground M is that the services were never actually available to him. And without them being available, he cannot have violated or I should say failed to meet the requirements of Ground M. With regard to Ground B, it's entirely focused on his lack of responsibility purportedly because he failed to perform services. But it goes back again to our argument that these services were never made available to him. And that is the reason why he did not complete them. One final point with regard to the drug drop issue, and that is he was frequent with his drug drops at the very beginning. After it appears, and looking at the record, it appears that they drop off after he has been assessed for drug usage and found that he is not a person who uses drugs. And as a consequence, there was no further referrals necessary for him following that assessment. At that particular point, he loses interest in doing the drug drops. And I would suggest the case law, which seems to indicate that he should not have been required to undertake further drug drops after he was assessed as someone who does not take drugs. That's all I have, Your Honors. If you have any other questions, I certainly answered them. But my feeling is that if you read my briefs carefully and you read the timeline that makes very detailed reference to the record, you will find that none of the grounds in this particular case were met strictly and that there is not enough evidence to support any of the grounds and that he should not, under those circumstances, have been found unfit. Thank you. Any questions? I have none. All right. Thank you all for your presentation. You both, or all four of you, gave a good shot at trying to redeem these people. And you were very positive, especially like Julia Johnson's. She kind of summed up everything right to the point, as I see it. So I thank you all. We'll let you know as soon as we see what the three of us agree on. Thank you, Your Honors.